IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| LIBERTARIAN PARTY OF OHIO, KEVIN KNEDLER, and MICHAEL JOHNSTON | Case No. 2:11-CV-722 |
| Plaintiffs, | |
| v. | JUDGE ALGENON L. MARBLEY |
| JON HUSTED, | MAGISTRATE JUDGE NORAH KING |
| Defendant. | |

**OPINION & ORDER**

**I. INTRODUCTION**

This matter is before the Court on the Motion of Plaintiffs Libertarian Party of Ohio ("LPO"), Kevin Knedler, and Michael Johnston for a Preliminary Injunction. (Dkt. 5.) Plaintiffs seek to enjoin Defendant Jon Husted, the Ohio Secretary of State, from enforcing H.B. 194's changes to O.R.C. §§ 3501.01 and 3517.01 and to restore the Libertarian Party of Ohio's ballot access rights. For the following reasons, the Motion is **GRANTED**.

**II. BACKGROUND**

This is the third time in five years that the Libertarian Party of Ohio has come before this Court to challenge Ohio's ballot access laws. In *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006), the Sixth Circuit found that the combination of Ohio's November filing deadline for new political parties and its signature requirement that new parties submit signatures from voters equal to 1% of the total vote cast in the last election for President or Governor was unconstitutional. The Ohio Legislature failed to respond to this ruling. As a result, Ohio's Secretary of State administratively adopted new ballot access rules. The Secretary changed the

signature requirement from 1% to 0.5%, and moved the filing deadline 20 days closer to election, from 120 to 100 days before the primary. The LPO challenged these rules. In *Libertarian Party of Ohio v. Brunner*, 462 F.Supp.2d 1006 (S.D. Ohio 2008), this Court found that the Ohio Secretary of State did not have the authority to set election rules. In the alternative, the Court found that the Secretary's interim filing deadline and interim signature requirement would likely be found unconstitutional.

Following the decision in *Brunner*, this Court found that the LPO had the requisite community support to merit ballot access, and ordered that the LPO, along with three other minor parties, be placed on Ohio's 2008 election ballot. The Secretary entered into a consent decree agreeing not to enforce her interim requirements, and adopted Directive 2009-21, which guaranteed that the LPO (and the three other minor parties) had continued ballot access. On January 6, 2011, the Secretary reinstated Directive 2009-21 in Directive 2011-01, which continued ballot access for the LPO in 2011 and beyond.

On July 1, 2011 Ohio Governor Kasich signed Am. Sub. H.B. 194 into law. The bill is scheduled to become effective on September 30, 2011. It makes changes to provisional ballot law, voter identification laws, absentee voting, voter eligibility, and ballot access for political parties. This litigation is focused on the changes to ballot access for political parties. In particular it focuses on amendments to O.R.C. § 3501.01(E)[1] and O.R.C. § 3517.01(A)(1).[2] In

---

[1] O.R.C. § 3501.01(E) was amended in the following manner, with the strike-through indicating the deletion of existing language:
>(E)(1) "Primary" or "primary election" means an election held for the purpose of nominating persons as candidates of political parties for election to offices, and for the purpose of electing persons as members of the controlling committees of political parties and as delegates and alternates to the conventions of political parties. Primary elections shall be held on the first Tuesday after the first Monday in May of each year except in years in which a presidential primary election is held.
>
>(2) "Presidential primary election" means a primary election as defined by division (E)(1) of this section at which an election is held for the purpose of choosing delegates and alternates to the national conventions of the major political parties pursuant to section 3513.12 of the Revised Code. Unless otherwise specified,

2

effect, these changes did little to change the rules governing ballot access. The Sixth Circuit found that the combination of the signature requirement with the early filing deadline was unconstitutional. The Legislature amended the filing requirement by a mere 30 days, and did nothing to the signature requirement. Thus, the bill requires that new parties qualify for Ohio's ballots no later than 90 days before the state's primaries which, under H.B. 194, are to take place on the first Tuesday following the first Monday in May. This date applies in both presidential and non-presidential primary cycles. Parties that did not receive 5% of the vote for Governor or President in the last election still must collect signatures from voters equal to 1% of the total vote cast in the last election for President or Governor. All that is different is that the party must file these signatures, not 120 days, but 90 days before the May primary.

As some Ohio citizens feel that these changes will restrict ballot access and contribute to voter suppression, the bill is currently the subject of a referendum effort. If referendum supporters can collect 231,147 signatures by September 29, 2011, then the bill will be stayed until it is voted on the Ohio electorate in the November 2012 election.

---

presidential primary elections are included in references to primary elections. ~~In years in which a presidential primary election is held, all primary elections shall be held on the first Tuesday after the first Monday in March except as otherwise authorized by a municipal or county charter.~~

[2] O.R.C. § 3517.01(A)(1) was amended in the following manner, with the strike-through indicating the deletion of existing language and bold indicating the addition of language:

> (A)(1) A political party within the meaning of Title XXXV of the Revised Code is any group of voters that, at the most recent regular state election, polled for its candidate for governor in the state or nominees for presidential electors at least five per cent of the entire vote cast for that office or that filed with the secretary of state, subsequent to any election in which it received less than five per cent of that vote, a petition signed by qualified electors equal in number to at least one per cent of the total vote for governor or nominees for presidential electors at the most recent election, declaring their intention of organizing a political party, the name of which shall be stated in the declaration, and of participating in the succeeding primary election, held in even-numbered years, that occurs more than ~~one hundred twenty~~ **ninety** days after the date of filing. No such group of electors shall assume a name or designation that is similar, in the opinion of the secretary of state, to that of an existing political party as to confuse or mislead the voters at an election. If any political party fails to cast five per cent of the total vote cast at an election for the office of governor or president, it shall cease to be a political party.

On August 5, 2011, the Secretary sent the LPO a letter indicating that the directives that Secretary Brunner had issued were now void. The LPO contends that this letter indicates the Secretary intends to use H.B. 194 to strip the LOP of its ballot access. Thus, the LPO posits that as of September 30, 2011, it will not be qualified for the November 2011 ballot. It challenges this removal. The evidence before the Court indicates that the LPO will be on the November 2011 ballot. The Deputy Assistant Secretary of State, Michael Damschroder, stated in an affidavit that: "HB 194 and the Secretary of State's letter of August 5, 2011 notwithstanding, Libertarian candidates for partisan municipal offices certified by a county board of elections to appear on the November 8, 2011 general election ballot on which all candidates were permitted to appear with a party affiliation (or alternate label as permitted by state law when the candidate has filed as an independent) will not have the label 'Libertarian' removed from the ballot aside those candidates' names." His testimony at the Preliminary Injunction hearing on August 30, 2011 was consistent with this statement.

The LPO also argues that H.B. 194's changes requiring the party to submit the required signatures 90 days before the primary ballot, in other words by February 8, 2012, in order to qualify for the 2012 ballot are unconstitutional.

### III. LAW AND ANALYSIS

Husted argues that the LPO's claims are not yet ripe. As a threshold matter, this Court will address the ripeness challenge before proceeding to the merits.

### A. RIPENESS

The State argues that the LPO's claim is not ripe. In order to determine if a claim is ripe, the Court will consider three factors: (1) the likelihood that the harm alleges by the Plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair

4

adjudication of the merits; and (3) the hardship to the parties if judicial relief is denied at this stage of the proceedings. *Warshak v. United States*, 490 F.3d 455, 467 (6th Cir. 2007).

The State argues that because the bill is not currently effective, and may not ever become effective due to the referendum effort, it is unclear if the Plaintiffs will ever suffer any harm as a result of this bill. Thus, the State asserts, the Plaintiffs cannot meet prong (1) of the three-factor test and the claim is not ripe.

This argument is not compelling. The Court makes decisions based on the realities it confronts, not on mere possibilities. As the record currently stands, the bill is to become effective in less than a month. The State has already begun taking steps to enforce the new law. In fact, it has already notified the LPO that as a result of the law, the LPO is not currently a qualified party for the 2012 election. The State cannot take actions based on the law, yet simultaneously argue that the law in not ripe for challenges. As a result of the State's actions, the Plaintiffs may be harmed. Thus, the case is ripe for consideration.

### B. MERITS

In order to obtain a preliminary injunction, this Court balances the following four factors: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

**1. Likelihood of Success on the Merits**

The state's amendments to O.R.C. § 3501.01(E) and O.R.C. § 3517.01(A)(1) do little to address the concerns of the Sixth Circuit in *Blackwell* and of this Court in *Brunner*.[3] The central issue before the Court is whether the Ohio election laws impermissibly burden the plaintiff's rights to free speech and association under the First Amendment. The state laws at issue burden two different, but overlapping, rights. First, they infringe upon "the right of individuals to associate for the advancement of political beliefs," and second, "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). These rights are critically important to the success of our representative democracy. *See California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (noting that "[i]t is beyond cavil that voting is of the most fundamental significance under our constitutional structure") (internal citation omitted)).

Nevertheless, states "may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). With this in mind, the Supreme Court established an analytical framework in *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) to analyze election laws. As the Sixth Circuit explained in *Blackwell*:

---

[3] While the holdings of *Blackwell* and *Brunner* are limited to presidential election years, the analysis these cases undertake in order to determine the severity of the burdens placed on political parties attempting to organize is applicable to all election cycles, both presidential and non-presidential.

6

> First, the court looks at the "character and magnitude of the asserted injury" to petitioner's constitutional rights. *Anderson*, 460 U.S. at 789. The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* If petitioner's rights are subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). But if the state law imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights, then the interests of the state in regulating elections is "generally sufficient to justify" the restrictions. *Id.* (quoting *Anderson*, 460 U.S. at 788).

*Blackwell*, 462 F.3d at 585-87.

### a. Magnitude of the Burden

Following the *Anderson/Burdick* framework, this Court must first determine if "character and magnitude of the asserted injury" renders it severe. *Blackwell*, 462 F.3d at 585. The LPO identifies the injury as follows: the collective impact of the state's requirements—that to achieve ballot access a party must: (1) obtain signatures from 1% of the voters in the last gubernatorial election; and (2) file then 90 days before the primary—unconstitutionally burdens the First Amendment rights of the Libertarian Party and its supporters. Deadlines so far in advance of the election force minor parties to recruit candidates at a time when major party candidates are not known and when voters are not politically engaged. *See Blackwell*, 462 F.3d at 594; *see also Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 880 (3d Cir. 1997) (finding that an April deadline, which was 60 days in advance of the primary, required minor parties to rally support "when the election is remote and voters are generally uninterested in the campaign"). In effect, these deadlines protect the two major parties at the expense of a more vigorous, deliberative democracy. *See Blackwell*, 462 F.3d at 594. Thus, minor parties are limited in attracting candidates to the ballot, and the citizenry may be limited in their ability to cast votes for individuals who represent their beliefs or values. As "[t]he ability of a political party to appear on the general election ballot affects not only the party's rights, but also the First

7

Amendment rights of voters," *Blackwell*, 462 F.3d at 587, courts have found that burdens of this kind are severe, *see, e.g., Anderson*, 460 U.S. at 793-94 ("A burden that falls unequally on new or small political parties . . . impinges, by its very nature, on associational choices protected by the First Amendment.  It discriminates against those candidates-and of particular importance-against those voters whose political preferences lie outside the existing political parties.").

In *Brunner*, for example, this Court found that requirements of 100 days and signatures of .5% of the voters from the last gubernatorial primary imposed a severe, unconstitutional burden. *Brunner*, 567 F.Supp.ed at 1014.  The new requirements do not address the concerns identified in that case.  In fact, one could argue that they are worse.  In exchange for moving the deadline 10 days closer to the election, the legislature has decided to double the number of signatures required.  As the Sixth Circuit stated in *Blackwell*, "the restrictions at issue in this case serve to prevent a minor political party from engaging in the most fundamental of political activities-recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately, the right to govern."  *Blackwell*, 462 F.3d at 590. A minor party must collect a large number of signatures 90 days before the primary, and 279 days before the general election.[4]  These requirements limit the ability of the party to campaign, to recruit members, and to participate in the most basic of democratic processes.

The ultimate goal of any political party is to govern.  Ballot access is fundamental to achieving this goal and preserving the autonomy of political parties.  Yet these requirements impose a tremendous burden on those parties that seek to field candidates for election, but may have fewer resources than the two major parties. *See Wood v. Meadows*, 207 F.3d 708, 711 (4th Cir. 2000) (noting that "courts have subjected to searching scrutiny state laws requiring both

---

[4] These numbers are based on H.B. 194 and the assumption that the 2012 primary will occur in May 2012 as outlined in the bill.

party primary candidates and independent candidates to announce their candidacies by the same March deadline, well prior to the primary elections"); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 881 (3d Cir. 1997) (finding that early spring filing deadline of April 10, even with an extremely low signature requirement, unconstitutionally burdened First Amendment rights of minor political parties and their supporters). Thus, this Court finds that the burden imposed by the state laws at issue is severe, and strict scrutiny is required.

### b. The State's Justification

Next, this Court must consider the State's justification for the laws in order to determine if they are "narrowly drawn to advance a compelling state interest." *Burdick*, 504 U.S. at 434. Ohio makes two main arguments to support the new laws. First, it argues that these requirements are justified because the state's statutory requirements for elections are numerous and time-consuming. Due to "all of this work," the State asserts, its requirements are reasonable. Such justification is inadequate. Quite simply, having a lot of work is not an explanation for severe burdens on constitutional rights. While it may reasonable to assume that the State needs 90 days to process the paperwork, it does not further a compelling state interest. *See Blackwell*, 462 F.3d at 593.

Second, the State argues that it has an interest in ensuring that political parties have a modicum of support, which helps avoid confusion, deception, and frustration in the democratic process. The Supreme Court and the Sixth Circuit have recognized that these are viable state interests. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363-4 (1997); *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005). Nevertheless, the State has not explained how early primary deadlines and large signature requirements further these goals. The connection between early deadlines and avoiding confusion is unclear, as is how keeping parties off the

9

ballot eliminates frustration in the democratic process. It seems equally likely that citizens may be frustrated by the limited options available to them at the ballot box. While this Court will not impose a view of democracy on the State, it would seem that the State and its citizens have an interest in a vibrant political discourse that seeks new solutions to intractable problems. Political parties have a First Amendment right to present their ideas to an eager public, and the public has a First Amendment right to listen to party platforms and select the most compelling. The State's laws do not further, but instead significantly inhibit the furtherance of these goals.

The State urges this Court to follow a recent Eighth Circuit case, *Green Party of Arkansas v. Martin*, No. 10-3106, 2011 U.S. App. LEXIS 16365 (Aug 9. 2011 8th Cir.). In that case, the Eighth Circuit upheld an Arkansas law that required a new political party to obtain the signatures of 10,000 registered voters during a ninety-day period of time chosen by the party. This Court does not find the factual background of that case analogous to the current situation. The dual concerns implicated in this case—the First Amendment rights of parties and of voters—are particularly acute because Ohio has a long history of excluding minor parties from mainstream political discourse. *See Blackwell*, 462 F.3d at 589-90 (noting that of the eight most populous states, Ohio has the lowest number of minor political parties on its ballots). The absence of these minor parties does not reflect an absence of diversity, but instead the stifling impact of restrictive ballot access laws. Ohio's history compels this Court to approach the new laws with a healthy degree of skepticism. *See Storer v. Brown*, 415 U.S. 724, 742 (1974) (noting that "[p]ast experience will be a helpful, if not always an unerring, guide" to determine the burden that election laws impose); *Blackwell*, 462 F.3d at 589-90 (noting that "a historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality"). Accordingly, since the State has not explained

10

how the deadline and the signature requirement are narrowly tailored, this Court finds that this combination violates the First Amendment to the Constitution.

### 2. Irreparable Harm

The irreparable harm to the Libertarian Party and its candidates is denial of access to the ballot. This Court finds that this constitutes irreparable injury that is not compensable by monetary damages. Thus, injunctive relief is appropriate.

### 3. Harm to Others and the Public

The harm to others and the public is the damage to "political dialogue and free expression" that is done when political parties are unnecessarily restricted from participating in the public discourse. *Blackwell*, 462 F.3d at 594. In this case, the State has not shown that the laws at issue further compelling state interests. In fact, they inhibit the ability of the citizens of Ohio to organize into political parties and to make their voice heard at the level necessary to effect political change.

### 4. Balancing the Harms

In sum, each of the four factors counsels in favor of granting a preliminary injunction. The State is enjoined from enforcing H.B. 194's changes to O.R.C. §§ 3501.01(E) and 3517.01(A)(1). The State has repeatedly assured this Court that the LPO will appear on the ballot in the November 2011 elections, and that individual candidates will be identified as candidates of the Libertarian Party of Ohio. Thus, the State should have no problem complying with this Court's order in 2011. This Court will not instruct the State how to manage its

elections in 2012, but requires it to take the steps to enact ballot access laws that address the constitutional deficiencies identified here, in *Brunner*, and in *Blackwell*.

**IT IS SO ORDERED.**

s/Algenon L. Marbley<br>Algenon L. Marbley<br>United States District Judge

Dated:  September 7, 2011